UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHRISTINE DECAMP, as Guardian
of the Property of
Timothy Decamp, Jr. and
assignee of Jasmina Woltcheck,
and CONSTANCE DECAMP,
as Guardian of the Person
of Timothy Decamp, Jr.
and assignee of Jasmina Woltcheck,

     Plaintiffs,

v.                                    Case No. 8:20-cv-1747-VMC-TGW

STATE FARM FIRE & CASUALTY
COMPANY,

     Defendant.
_____/

## ORDER

    This matter comes before the Court upon consideration of
Defendant State Farm Fire & Casualty Company's Motion for
Final Summary Judgment (Doc. # 45), filed on August 9, 2021.
Plaintiffs Christine Decamp and Constance Decamp, as
Guardians of Timothy Decamp, Jr. and assignees of Jasmina
Woltcheck, responded on September 3, 2021. (Doc. # 57). State
Farm replied on September 16, 2021. (Doc. # 61). For the
reasons that follow, the Motion is granted in part and denied
in part.

1

I.   **Background**

   A.   **The Accident and the Aftermath**

   On the night of November 17, 2009, Jasmina Woltcheck was driving to work when she hit pedestrian Timothy Decamp, Jr. (Doc. # 44-2 Woltcheck Dep. at 5:9-7:21). Prior to the accident, Mr. Decamp was unable to work because he has Asperger's syndrome, Tourette's syndrome, and obsessive-compulsive disorder. He was receiving Supplemental Security Income ("SSI"). His SSI checks were deposited into a custodial account controlled, with his consent, by his sister, Christine Decamp. (Doc. # 44-5 Christine Decamp Dep. at 12:24-14:19, 58:3-19).

   State Farm provided bodily injury liability coverage to Woltcheck with limits of $50,000 per person and $100,000 per accident. (Doc. # 44-1 Owen Aff. & attachment; Doc. # 44-3 Leeper Dep. at Ex. 10 at 7-9). The supplemental payments provision of the policy, as modified by an endorsement, states in relevant part:

   > In addition to the limits of liability, we will pay for an *insured* any costs listed below resulting from such accident.
   >
   > 1. Court costs of any suit for damages.
   >
   > . . .

2

> 4. The following costs and expenses if related to and incurred after a civil lawsuit has been filed against an *insured* for damages for which liability coverage is provided by this policy:
>
> > a. loss of wages or salary, but not other income, up to $100 for each day an *insured* attends at our request:
> >
> > > (1) an arbitration;
> > >
> > > (2) a mediation; or
> > >
> > > (3) a trial of a civil suit.
> >
> > b. reasonable expenses incurred by an *insured* at our request, other than loss of wages, salary, or other income.
> >
> > The amount of any of the costs or expenses listed above that are incurred by an *insured* must be reported to us before we will pay.

(Doc. # 44-1 at 13, 41). The supplemental payments provision ends with the sentence: "We have the right to investigate, negotiate and settle any claim or suit." (Id. at 13).

Adjuster Zachary Chauhan sent a letter to Mr. Decamp the day after the accident to make contact with him. (Doc. # 44-3 Leeper Dep. at 30:12-14).

Mr. Decamp's injuries from the motor-vehicle accident left him unable to communicate for several months. Mr. Decamp's mother, Constance Decamp, and Christine Decamp, along with other relatives, retained Daniel Leeper, Esq., shortly after the accident. (Id. at 23:10-24:15).

The Decamps were concerned that Mr. Decamp would lose his SSI and Medicaid if he received too much money in a settlement, which had happened before when he received an inheritance from his father. (Id. at 34:11-35:8). Leeper determined that the way to maintain Mr. Decamp's eligibility for SSI and Medicaid was to place the settlement proceeds in a special-needs trust. A special-needs trust allows a trustee to pay for a ward's needs without jeopardizing the ward's eligibility for Medicaid or SSI, which are lost if a beneficiary receives a certain amount of money over a legal maximum. (Id. at 19:11-20:18, 34:2-35:2, 61:1-3).

Leeper spoke to State Farm's adjuster Chauhan on December 2, 2009, and sent a confirmation letter the same day. (Id. at 30:15-20 & Ex. 10 at 10-11). During the conversation, Leeper advised that Mr. Decamp was still in the neuro-intensive care unit, had already undergone surgeries, and would undergo more. (Id. at 32:16-33:23). He noted that the family wanted to set up a special-needs trust so that Mr. Decamp would not lose his benefits. (Id. at 33:24-34:2, 35:8-13, 36:19-38:25 & Ex 10 at 10-11).

Leeper's letter requested disclosure of State Farm's bodily injury policy limit. Leeper also requested that Woltcheck fill out a financial affidavit on a form that he

4

provided. State Farm retained Bruce Austin, Esq., to assist Woltcheck with the affidavit. (Id. at 37:4-7, 39:1-10 & Ex. 10 thereto at 12-14).

Leeper's letter also stated that Mr. Decamp's mother and family did not want any settlement to jeopardize Mr. Decamp's continued eligibility for SSI and Medicaid:

> To that end, I request State Farm agree to provide assistance in resolving this case in a manner that preserves those benefits and will work with you to that end. This may include establishment of some sort of trust which the family will ask State Farm [to] provide for. I look forward to hearing from State Farm concerning their thoughts and position on how best we can resolve this matter on behalf of all concerned.

(Id. at Ex. 10 at 10-11).

Austin provided Leeper with Woltcheck's completed financial affidavit on December 8, 2009. It attested that Woltcheck's mortgage exceeded the value of her home, that her combined savings and checking accounts contained less than $5,000, that her combined IRA and 401K accounts were valued between $10,000 and $12,000, that she was not within the course and scope of employment, and that she had no other liability coverage. (Doc. # 44-2 Woltcheck Dep. at Ex. 1; Doc. # 44-3 Leeper Dep. at 88:1-89:23). State Farm also provided Leeper with a statement pursuant to Florida Statute

§ 627.4137 attesting to the policy limits. (Doc. # 44-3 Leeper Dep., Ex. 10 at 7-8).

###   B.   <u>Settlement Offers</u>

On December 17, 2009 – thirty days after the accident and prior to receiving any settlement demand – Austin wrote to Leeper offering to settle Mr. Decamp's claim against Woltcheck for her $50,000 policy limit. (<u>Id.</u> at Ex. 14). The letter offered to cooperate with the Decamps to structure the settlement in a manner that did not jeopardize Mr. Decamp's eligibility for SSI or Medicaid:

> I have not attached a check with this letter, since you have asked that a settlement be coordinated in a manner which would not adversely affect your client's receipt of SSI and Medicaid benefits. To this end, if you have established a special needs trust for your client, State Farm is more than willing to issue the settlement draft to the trust so long as a properly executed Release is provided in favor of the insured, Jasmina Woltcheck. If you would prefer a structure[d] settlement of the $50,000 tender, we will prepare and submit structure[d] settlement statements for your review. If your client would prefer the policy limits paid as a lump sum, please let me know how you would have the draft made payable and I will provide you the settlement draft and a proposed settlement release for your consideration.

(<u>Id.</u>).

State Farm adjuster Chauhan sent a second letter on January 21, 2010, offering to settle Mr. Decamp's claim

against Woltcheck for $50,000 in exchange for a release. (Id. at 81:7-15 & Ex. 10 at 6).

Christine Decamp testified that the $50,000 policy limit alone was not enough money: "[A]fter the added expense of having to pay for the establishment of the guardianship and special needs trust ourselves out of that settlement money, it would have left [Mr. Decamp] with a negligible amount of money." (Doc. # 44-5 Christine Decamp Dep. at 35:14-18). Accordingly, the Decamps decided to reject the $50,000 settlement offer. (Id. at 34:10-36:5).

Christine Decamp also testified that they would not have been willing to settle for $50,000 even if Leeper were willing to waive his contingency fee so that they could use the money that would have gone to Leeper to hire another attorney to establish the guardianship and special-needs trust. (Id. at 36:23-37:10). Christine Decamp is the ultimate decision-maker with respect to settling Mr. Decamp's claim. (Id. at 38:4-8).

Leeper wrote to State Farm on February 2, 2010, stating that the Decamps would settle the claim against Woltcheck only if State Farm would agree to pay their attorney's fees for establishing a guardianship and a special-needs trust at an estimated cost of $15,000. (Doc. # 44-3 Leeper Dep. at

45:11-46:4 & Ex. 10 at 4-5). Although this letter suggested State Farm use an attorney named Mr. Faglie to set up the trust, Leeper would have been fine with State Farm hiring a different attorney of its choice to establish the guardianship and trust. (Id. at 68:10-15).

On February 8, 2010, Leeper spoke to Chauhan, who told him that State Farm did not have a duty to pay for the guardianship and special-needs trust. Instead, he suggested a structured settlement as an alternative. Leeper replied that he believed a structured settlement would not preserve Mr. Decamp's government benefits. (Id. at 76:1-77:25).

Although she could not remember the timing, Woltcheck recalls someone at State Farm explaining to her that she could contribute her own funds toward a settlement, but she told State Farm that she did not have enough money to do so. (Doc. # 44-2 Woltcheck Dep. at 15:6-17:9, 18:5-20:25). Woltcheck was living paycheck-to-paycheck and sharing a home with her ex-husband and son, and she spent her weekly earnings on car payments and rent. (Id. at 21:19-22:6).

Moreover, Woltcheck was unwilling to contribute any personal funds toward a settlement. She felt that the accident was not her fault, testifying:

> I felt, at the time, I was not responsible.
> Actually, at the time, I remember the $50,000,
> [be]cause I even questioned. I said, it's really
> not my fault what happened. He ran into my car and
> then they expect me to pay for everything. I mean,
> how is that fair? So then he said that we're not –
> we're not going to even go after them or go
> whatever, because he had such extensive injuries
> that they felt that the $50,000, they'll just give
> it to them. But then they wanted an additional 15
> grand for them to put it in a trust and to hide it
> from the government, so that – at that point, I
> felt it was not my fault or not my responsibility
> to where they put their money in. My – my policy is
> 50 grand. They were willing to give it. The other
> 15, I felt that I'm not responsible for it because,
> at that point, they can put their money wherever
> they want. They have the 50,000, they can use
> whatever they needed to use it for. So I didn't
> feel I should contribute to something that they
> wanted to hide from the government. That was my
> thinking at the time and I still believe in that.

(Id. at 17:22-18:16). Woltcheck also testified that she would not have been willing to borrow $15,000, or any portion of it, to contribute toward the cost of a guardianship or special-needs trust or court approval of a settlement. (Id. at 83:9-15).

Again, Woltcheck does not remember exactly when she had the above-referenced discussions with State Farm about contributing to a settlement. (Id. at 18:17-19:7). Regardless, she testified that there was no point in time at which she would have been willing to contribute her personal funds toward setting up a guardianship and special-needs

trust. (Id. at 20:5-21:17). She said: "I felt that if they want to do anything with the guardianship or any legal issues like that, that's their responsibility." (Id. at 21:15-17).

**C.   Civil   Remedy   Notice   and   Establishment   of   Guardianship**

Roughly a month after the February 8, 2010 demand for payment of the Decamps' legal expenses relating to establishing the guardianship and special-needs trust, Leeper filed a Civil Remedy Notice of Insurer Violation ("CRN") with the Florida Department of Financial Services on March 5, 2010. (Doc. # 44-3 Leeper Dep. at Ex. 13). The CRN asserted that State Farm's policy provided: "IN ADDITION TO THE LIMITS OF LIABILITY, WE WILL PAY FOR AN INSURED ANY COSTS LISTED BELOW RESULTING FROM SUCH ACCIDENT. 1. COURT COSTS F [sic] ANY SUIT FOR DAMAGES." (Id. at Ex. 13 at 2). The CRN complained that State Farm was refusing to pay for the Decamps' legal expenses for the guardianship and special-needs trust, asserting that "THE INSURER HAS VIOLATED INDUSTRY STANDARDS IN REFUSING TO PAY FOR THE COSTS NEEDED TO ESTABLISH THE SPECIAL NEEDS TRUST AND THE GUARDIANSHIP" and "THE INSURER'S POLICY STATES THAT IT WILL PAY SUCH COURT COSTS ABOVE AND BEYOND THE POLICY LIMITS." (Id. at Ex. 13 at 3). The CRN alleged that State Farm had made a "material misrepresentation" with intent to

settle the claim "on less favorable terms than those provided in, and contemplated by, such contract or policy." (Id. at Ex. 13 at 2). It also contended that State Farm had not attempted in good faith to settle the claim when, under all the circumstances, "it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests." (Id.).

State Farm Team Manager Michael Dupree responded on May 3, 2010:

> After thoroughly reviewing and evaluating this case, we made a good faith policy limit offer to settle Mr. Decamp's bodily injury claim. We do not agree that we owe expenses above policy limit to set up a guardianship. However by way of this response, we again offer $50,000 policy limit to settle this claim.

(Doc. # 45-1).

Leeper testified that the guardianship was necessitated by State Farm's request for a signed release because Mr. Decamp was not competent to sign it. (Doc. # 44-3 Leeper Dep. at 22:15-22). Still, the Decamps and their counsel concede that a guardianship needed to be set up for Mr. Decamp, with or without a settlement, because he was unable to make financial or medical decisions for himself. (Doc. # 44-5 Christine Decamp Dep. at 31:13-32:9; Doc. # 44-3 Leeper Dep. at 43:16-44:15).

Leeper practices law with his law partner and spouse Silvia Leeper, Esq. (Doc. # 44-3 Leeper Dep. at 5:9-12). Silvia Leeper primarily practices family law. (Id. at 6:25-7:2). She also practices probate and guardianship law. (Id. at 7:6-10). Silvia Leeper ultimately set up the guardianship for Mr. Decamp, naming Constance Decamp as guardian of Mr. Decamp's person and Christine Decamp as guardian of his property. (Id. at 7:3-10:7 & Exs. 7-8). The guardianships were established effective June 18, 2010. (Id. at 12:24-13:2).

Another attorney, Lee Carr, Esq., eventually established a special-needs trust for Mr. Decamp in October 2011. (Doc. # 44-5 Christine Decamp Dep. at 28:9-29:21). Carr's fees for doing so were paid out of Mr. Decamp's SSI benefits. (Id. at 30:4-8).

Adjuster Chauhan wrote to Leeper again on September 17, 2010 – after the guardianships had been established but before the Decamps filed suit against Woltcheck – again offering to settle the claim for $50,000. The letter stated:

> This is a follow-up to our letter of January 21, 2010. As of this date, we have not received a response from you. State Farm is offering $50,000.00 in an effort to settle the above-referenced Bodily Injury claim against our insured(s) in exchange for a Release. Please review

> our offer of settlement and advise us of your
> position in this matter.

(Doc. # 44-3 Leeper Dep. at 81:16-23 & Ex. 10 at 1). The letter ended with a post-script stating: "Again I must reiterate that State Farm is not responsible for the fees and costs for setting up a trust and/or guardianship for your client." (Id. at Ex. 10 at 1).

### D.   __State Court Action__

Even after the guardianship was in place, the Decamps, as guardians, did not accept a settlement on Mr. Decamp's behalf. Instead, in April 2011, the Decamps filed suit against Woltcheck. (Id. at 16:11-23, 27:7-12).

Leeper and the Decamps concede that they did not file suit against Woltcheck believing that Woltcheck could pay a judgment exceeding her $50,000 policy limit; they filed suit intending to obtain a judgment against her and then attempt to collect the judgment from State Farm. (Id. at 94:18-97:8; Doc. # 44-5 Christine Decamp Dep. at 52:7-53:7). Six years into the litigation, on July 19, 2017, Leeper reached a verbal agreement with State Farm to resolve the litigation via a $1.5 million Cunningham agreement. (Doc. # 44-3 Leeper Dep. at 82:16-84:12).

Woltcheck testified that she would not agree to a Cunningham agreement that required her to sue State Farm because she did not believe that State Farm had done anything wrong. (Doc. # 44-2 Woltcheck Dep. at 24:25-25:11). The Cunningham agreement was finalized eighteen months later, with State Farm executing it first on January 8, 2019, Woltcheck on January 19, 2019, Christine Decamp on February 7, 2019, and Constance Decamp on May 16, 2019. (Id. at 22:18-24 & Ex. 3 at 6-9; Doc. # 44-7 at ¶ 3; Doc. # 44-8 at ¶ 3).

The Cunningham agreement states that the parties agree to entry of a Final Judgment against Woltcheck for $1,500,000.00. (Doc. # 1-1 at ¶ 1). The agreement further provides that State Farm would pay Woltcheck's $50,000 policy limit to the Decamps in exchange for a partial satisfaction of judgment, and the Decamps would then collect the balance of the judgment by pursuing a bad-faith action against State Farm. (Id. at ¶¶ 5-6). The Decamps agreed never to record the judgment or attempt to collect it from Woltcheck, and the Decamps agreed to provide Woltcheck with a satisfaction of judgment at the conclusion of this bad-faith action regardless of the outcome. (Id. at ¶ 6).

Notwithstanding the parties' agreement to entry of a judgment against Woltcheck, the underlying action was

terminated, instead, by an order of dismissal dated November 16, 2018 – roughly a month and a half before the first signature on the Cunningham agreement. (Doc. # 44-7 at ¶ 1 & Ex. A; Doc. # 44-8 at ¶ 1).

On August 25, 2020 — almost two years after the state court action was dismissed and approximately one month after this federal court action was filed by the Decamps — the Decamps filed a motion in the state court action entitled "Unopposed Motion to Set Aside 11/18/2018 Final Judgment and for Substitution Based on Subsequently Executed Settlement Agreement of the Parties and Defendant's Liability Insurer." The trial court entered an order granting the motion. (Doc. # 44-7 at ¶¶ 5-6 & Exs. B-C; Doc. # 44-8 at ¶¶ 5-6).

The Decamps then filed an "Amended Unopposed Motion to Set Aside 11/18/2018 Dismissal and for Substitution of a Final Judgment Based on Subsequently Executed Settlement Agreement of the Parties and Defendant's Liability Insurer." The trial court then entered a $1,500,000 judgment against Woltcheck on October 20, 2020. (Doc. # 44-7 at ¶¶ 7-8 & Exs. D-E; Doc. # 44-8 at ¶¶ 7-8).

**E.   Other Instances of Guardianship Payments**

Leeper testified that, in other cases, he had dealt with insurance companies that would pay to establish guardianships

for injured minor claimants. (Doc. # 44-3 Leeper Dep. at 20:21-21:2; 48:20-49:25).

Likewise, Daniel Doucette, an expert in the insurance industry, opined that "in refusing to pay or contribute to the expense of the guardianship to resolve this catastrophic claim, State Farm was not acting consistent with the custom and practice in the industry." (Doc. # 42-10 at 10). "State Farm and other carriers had done this many times to obtain a settlement and there is no reason why it should not have been done in this case." (Id.).

Doucette explained that the guardianship and trust fees would be classified by insurance companies like State Farm as expenses, rather than indemnity payments governed by the terms of the insurance policy. (Id. at 7). One type of expense is an allocated loss expense ("ALE"), which "reflects payments made specifically because of activity in a claim file." (Id.). Although there is no one binding definition of ALE, ALEs are "routine expenses incurred by a company in appropriate cases," including costs of compulsory medical exams, "coverage counsel," "attorneys helping to prepare financial affidavits," and "attorneys for minor guardianships and fees of the" guardian ad litem. (Id. at 7-8). Doucette opined further that it "is irrelevant that the policy does

16

not promise to pay for guardianship costs" because the "policy does not specify many of the very routine expenses insurers pay daily." (Id. at 10).

Indeed, State Farm has paid to establish guardianships for incapacitated adult claimants at least twelve times in Florida since 2009, and has paid to establish guardianships for the minor children of deceased adults multiple times as well. (Doc. # 64-2; Doc. # 73 at 1, 2 n.1). In all of these instances, the costs of establishing the guardianship were coded by State Farm as defense costs or defense attorney's fees, rather than as indemnity payments. (Doc. # 64-2; Doc. # 64-1 at 35:10-38:15).

**F.    <u>Procedural History</u>**

The Decamps, as Guardians for Timothy Decamp, Jr., initiated this action on July 29, 2020, asserting claims against State Farm for common law bad faith (Count I), statutory bad faith (Count II), and unfair claim settlement practices (Count III). (Doc. # 1). State Farm filed its answer and affirmative defenses on October 28, 2020 (Doc. # 15), and the case proceeded through discovery.

Now, State Farm moves for summary judgment in its favor. (Doc. # 45). The Motion is fully briefed (Doc. ## 57, 61, 64, 73, 74), and ripe for review.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the

18

pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. **Analysis**

### A.   **Validity of the Underlying Judgment**

First, State Farm argues that the claims against it fail because the judgment entered against Woltcheck in state court

is void. (Doc. # 45 at 23-26). Specifically, it contends the judgment is void because the state court had dismissed the lawsuit nearly two years before the Decamps sought to set aside the dismissal and have the state court enter the Cunningham agreement as its judgment in that case.

Florida Rule of Civil Procedure 1.540(b) states in relevant part:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, decree, order, or proceeding for the following reasons:
>
> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial or rehearing;
>
> (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;
>
> (4) that the judgment, decree, or order is void; or
>
> (5) **that the judgment, decree, or order has been satisfied, released, or discharged, or a prior judgment, decree, or order upon which it is based** has been reversed or otherwise vacated, or **it is no longer equitable that the judgment, decree, or order should have prospective application.**
>
> The motion shall be filed within a reasonable time, and for reasons (1), (2), and (3) not more than 1 year after the judgment, decree, order, or proceeding was entered or taken.

Fla. R. Civ. P. 1.540(b) (emphasis added).

Here, the judgment was entered over a year after the case was closed. Thus, Rule 1.540(b)(1)-(3) cannot form the basis for the entry of the judgment. Rather, the motion to set aside the dismissal and enter a judgment memorializing the terms of the Cunningham agreement relied on Rule 1.540(b)(5). The motion stated that the new circumstance of the Cunningham agreement made it no longer equitable for the state court's dismissal order to stand. (Doc. # 44-7 at Ex. D). Based on this argument, the state court set aside the dismissal and entered a final judgment for $1,500,000 in favor of the Decamps and against Woltcheck. (Id. at Ex. C & E).

But according to State Farm, Rule 1.540(b)(5) did not apply because that rule only "provides jurisdiction to modify a final order where 'it is no longer equitable that the judgment, decree, or order should have prospective application'" and "a dismissal order does not have 'prospective' application." (Doc. # 61 at 6); see Curtiss-Wright Corp. v. Diaz, 507 So. 2d 1197, 1198 (Fla. 3d DCA 1987) (noting that, for purposes of Rule 1.540(b)(5), "a judgment dismissing a plaintiff's action for damages is not deemed to have prospective application merely because the plaintiff continues to be bound by it"), approved, 519 So. 2d 610 (Fla. 1988). Thus, State Farm reasons, because Rule 1.540(b)(5)

could not be used to set aside the dismissal order, the state court's order setting aside the dismissal and entering judgment in favor of the Decamps was legally void. (Id. at 7).

Even if the Court assumes that the state court judgment is void, the Court does not agree that the Decamps' claims must fail. As the Decamps note, there is case law indicating that an excess judgment is unnecessary where the parties have entered a Cunningham agreement:

> There are three exceptions [to the excess judgment rule], which are deemed 'functional equivalents' of an excess judgment under Florida law. When an exception applies, an insured can show causation based on a stipulation of damages rather than an excess judgment. The first exception is called a Cunningham agreement, wherein the insurance company and the injured third party agree to try the bad faith claim first, and, if the jury finds no bad faith, the parties agree to settle for policy limits.

Cawthorn v. Auto-Owners Ins. Co., 791 F. App'x 60, 64 (11th Cir. 2019) (citations omitted).

While State Farm argues this exception does not apply because the Cunningham agreement here anticipated entry of a judgment by the state court (Doc. # 61 at 7), it does not cite any case law establishing that Cunningham agreements are only exceptions to the excess judgment rule when they do not mention the entry of judgment. Thus, the Court is unpersuaded

by State Farm's argument. In short, the Decamps are not precluded from bringing this bad faith action.

**B.    <u>Merits Analysis</u>**

The Decamps assert three claims: common law bad faith (Count I), statutory bad faith (Count II), and unfair claim settlement practices (Count III). (Doc. # 1). State Farm maintains that the same analysis is applicable to all claims. (Doc. # 74).

"An insurer, in handling the defense of claims against its insured, has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." <u>Bos. Old Colony Ins. Co. v. Gutierrez</u>, 386 So. 2d 783, 785 (Fla. 1980)(citation omitted). "For when the insured has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement, then the insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured." <u>Id.</u> (citation omitted). "This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the

insured of any steps he might take to avoid same." Id. (citation omitted). "The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so." Id. (citation omitted).

"In determining whether an insurer has acted in bad faith in handling a claim, the totality of the circumstances standard is applied." Harrison v. State Farm Fire & Cas. Co., No. 2:12-cv-205-SPC-UAM, 2013 WL 12147771, at *7 (M.D. Fla. Dec. 11, 2013)(citation omitted), order clarified, No. 2:12-cv-205-SPC-UAM, 2013 WL 12156036 (M.D. Fla. Dec. 19, 2013). "While the issue of whether an insurer acted in bad faith is ordinarily a question for the jury, courts have, in certain circumstances, concluded as a matter of law that the insurance company did not act in bad faith." Id. (citation omitted).

The Decamps argue that State Farm acted in bad faith by (1) failing to advise and communicate with Woltcheck sufficiently and (2) refusing to pay for the costs of establishing Mr. Decamp's guardianship and special-needs trust. (Doc. # 57).

### 1.   **Communication with Woltcheck**

In their response, the Decamps argue that State Farm acted in bad faith in part because "State Farm [] failed to communicate with . . . Woltcheck in compliance with Florida law . . ., precluding summary judgment concerning allegations of failure to advise." (Doc. # 57 at 13). The Decamps highlight that State Farm never sent Woltcheck an "excess letter" and that State Farm's written correspondence and claims notes "through the filing and expiration of the Florida CRN are void of any discussion with the named insured of a potential excess judgment and/or the issue of contributing towards paying for guardianship proceedings and/or special needs trust." (Id.). And the Decamps contend that Woltcheck's deposition testimony is "irrational, contradictory and inconsistent" such that it should not be relied upon. (Id. at 13-14).

Even taking the evidence in the light most favorable to the Decamps, there is no genuine issue of material fact on the failure to advise allegations. Here, Woltcheck testified that she was advised by State Farm about the risk of an excess judgment and her ability to pay the costs of the guardianship and special-needs trust herself to obtain a settlement. (Doc. # 44-2 Woltcheck Dep. at 15:6-17:9). True, it is unclear when

State Farm had these conversations with Woltcheck because she could not recall the dates. Nevertheless, the uncertainty regarding time does not create a genuine issue of material fact on bad faith because Woltcheck likewise testified that she was at no point willing or able to pay any amount beyond her policy limits to reach a settlement. (Id. at 18:5-21:25).

Therefore, even if State Farm only advised Woltcheck of the risk of an excess judgment when it was "too late" as the Decamps assert, this failure was not the cause of the excess judgment later being entered against Woltcheck. See McGuire v. Nationwide Assur. Co., No. 8:11-cv-559-SCB-TBM, 2012 WL 712965, at *9 (M.D. Fla. Mar. 5, 2012) ("[E]ven if Nationwide had informed Torrey about McGuire's May 14, 2008 [settlement] demand and advised him to accept it, Torrey would have been unwilling or unable to do so, and her offer would still have been rejected. Accordingly, Nationwide's failure to communicate with Torrey about this offer did not result in the excess judgment, and without causation, there can be no bad faith damages."). The Motion is granted to the extent it seeks summary judgment on the Decamps' claims regarding the failure to advise or communicate theory.

**2.    Refusal    to    Pay    the    Decamps'    Fees**

It is undisputed that State Farm repeatedly offered to settle the claim for the policy limits of $50,000. The Decamps rejected these offers, demanding that State Farm also pay for the costs of setting up a guardianship and special-needs trust for Mr. Decamp. The Decamps even rejected State Farm's offer of the policy limits after the guardianship was already established. (Doc. # 44-3 Leeper Dep. at 7:3-10:7 & Exs. 7-8). The question is therefore whether State Farm acted in bad faith by refusing to pay the costs of the guardianship and special-needs trust.

The Court agrees with State Farm that no language in the relevant policy required State Farm to pay to set up a guardianship or special-needs trust for Mr. Decamp. First, the Court rejects the Decamps' argument that the following sentence from the supplemental payments provision obligated State Farm to pay the Decamps' fees and costs for the guardianship and special-needs trust: "We have the right to investigate, negotiate and settle any claim or suit." (Doc. # 44-1 at 13). Nowhere in this sentence does State Farm obligate itself to pay for a third-party claimant's fees, even if those fees to establish a guardianship enable to signing of a release and settlement of a case.

Next, the other portions of the supplemental payments provision, as amended by the policy's endorsement, likewise did not require the payment of the Decamps' fees to establish a guardianship or special-needs trust. The Decamps argue that the supplemental payments provision is ambiguous because it "fail[s] to specifically address [unallocated loss expenses and/or allocated loss expenses]." (Doc. # 57 at 10).

"Courts construe insurance contracts according to their plain language." Gov't Emps. Ins. Co. v. Macedo, 228 So. 3d 1111, 1113 (Fla. 2017) (citing Fayad v. Clarendon Nat'l Ins. Co., 899 So. 2d 1082, 1086 (Fla. 2005)). "However, any ambiguity which remains after reading each policy as a whole and endeavoring to give every provision its full meaning and operative effect must be liberally construed in favor of coverage and strictly against the insurer." Id. (citation and internal quotation marks omitted). "A provision is ambiguous if it is 'susceptible to two reasonable interpretations, one providing coverage and the other excluding coverage.'" Id. (quoting Fayad, 899 So.2d at 1086). "The ambiguity must be genuine, and the lack of a definition for an operative term does not, by itself, create an ambiguity." Id. (citation and internal quotation marks omitted). "When a term in an insurance policy is undefined, it should be given its plain

28

and ordinary meaning, and courts may look to legal and non-legal dictionary definitions to determine such a meaning." Id. (citation omitted).

But the lack of inclusion of loss expenses in the supplemental payments provision does not render it ambiguous; rather, this absence means that State Farm did not contractually obligate itself to pay such expenses in the policy. The supplemental payments provision is unambiguous and, by its plain terms, applies to "court costs of any suit for damages" and costs "incurred **after** a civil lawsuit has been filed against an insured for damages." (Doc. # 44-1 at 13, 41) (emphasis added). The lawsuit against Woltcheck had not been filed when the Decamps demanded payment of the guardianship and trust fees from State Farm and, in fact, they established the guardianship before they sued Woltcheck. (Doc. # 44-3 Leeper Dep. at 7:3-10:7 & Exs. 7-8). Regardless of whether a "friendly suit" qualifies as a suit for damages as the Decamps argue (Doc. # 57 at 9), no friendly suit was initiated here, so State Farm was not obligated to pay "court costs" for such friendly suit. The supplementary payments provision, which merely governs the incurred costs State Farm must pay, cannot be read as obligating State Farm to have filed a friendly suit.

Additionally, the Decamps' legal fees related to the guardianship and trust cannot be characterized as incurred by Woltcheck at all, let alone at State Farm's "request." (Doc. # 44-1 at 41). Thus, the portion of the supplementary payments provision covering "reasonable expenses incurred by an *insured* at our request" does not apply. In short, nothing in the policy's language required the payment of the Decamps' guardianship and special-needs trust fees by State Farm. See McGuire, 2012 WL 712965, at *8 ("Plaintiffs cite no case law to support their contention that the 'Additional Payments' provision obligates Nationwide to pay the cost of setting up Ms. Miller's guardianship. Furthermore, the Court finds the 'Additional Payments' provision to be unambiguous, and it clearly does not impose a duty on Nationwide to pay the cost of setting up a guardianship in addition to paying the $25,000 bodily injury policy limit.").

This leaves the Court with another question: can an insurance company be held liable for bad faith where it offered to pay the policy limits but refused to pay for costs that were not explicitly required under the terms of the insurance policy? Two district court opinions suggest opposite answers to this question. See McGuire, 2012 WL 712965, at *8; LaVigne v. Safeco Ins. Co. of Illinois, No.

3:17-cv-167-HES-PDB, 2018 WL 6308677, at *7 (M.D. Fla. Sept. 12, 2018). In McGuire, the Court granted summary judgment to the defendant insurance company, finding that the company "did not act in bad faith in refusing to pay the cost of setting up the injured claimant's guardianship" because the insurance policy did not contain a requirement to pay for such costs. McGuire, 2012 WL 712965, at *8. The court noted that the insurance company had later agreed to pay for the cost of the guardianship but emphasized that such "gratuitous agreement to pay such cost" did not "in any way show[] [the insurance company] was actually obligated to do so under the insurance policy." Id. at *8 n.7.

In contrast, the LaVigne court denied summary judgment on the bad faith claims, which were likewise premised in part on the insurance company's refusal to pay an injured claimant's guardianship costs in addition to the policy limits. LaVigne, 2018 WL 6308677, at *7. The LaVigne court distinguished McGuire because the totality of the circumstances in that case were different. Id. Specifically, in LaVigne, the plaintiff's expert, Mr. Doucette, opined that "in accordance with custom and practice in the industry, [the defendant insurance company] Safeco should have authorized the expenditure of 'a couple of thousand dollars to get the

31

guardianship appointed to eliminate a five million dollar exposure to their insured.'" Id. (citation omitted). "Importantly too, Safeco ha[d] a limited history of treating payments for guardianships as a claims expense," including a case in which "Safeco coded the payments in its system as adjustment expenses, not indemnity payments subject to policy limits." Id. The LaVigne court concluded that the insurance company's history of paying guardianship costs as claims expenses, "in conjunction with Doucette's opinions, [were] sufficient for this Court to distinguish this case with McGuire and determine an issue of fact exists." Id.

Based on the record before it, the Court agrees with the approach in LaVigne. In so deciding, the Court emphasizes that "an action for bad faith is extra contractual in nature and relates to the duties of an insurer as defined by statute, not the express terms of the contract." Townhouses of Highland Beach Condo. Ass'n, Inc. v. QBE Ins. Corp., 504 F. Supp. 2d 1307, 1310 (S.D. Fla. 2007). "This duty exists outside any contractual duties owed under the insurance policy, and it gives rise to an independent cause of action." King v. Gov't Emps. Ins. Co., No. 8:10-cv-977-JSM-AEP, 2012 WL 4052271, at *8 (M.D. Fla. Sept. 13, 2012); see also Blanchard v. State Farm Mut. Auto. Ins. Co., 575 So. 2d 1289,

1291 (Fla. 1991) ("Several courts have reasoned that the claim arising from bad faith is grounded upon a legal duty to act in good faith, and is thus separate and independent of the claim arising from the contractual obligation to perform."). "In other words, a plaintiff's bad faith claim may not necessarily be based on any specific policy language. It may instead be based on the insurer's statutory duty to act in good faith and deal fairly when handling the claims of its insureds." Wopshall v. Travelers Home & Marine Ins. Co., No. 18-14424-CIV, 2021 WL 1247501, at *7 (S.D. Fla. Mar. 29, 2021), reconsideration denied, No. 18-14424-CIV, 2021 WL 4189852 (S.D. Fla. Sept. 14, 2021).

True, the Court agrees with State Farm that State Farm was not required to pay over the $50,000 policy limit as an indemnity payment. See Mattadeen v. State Farm Mut. Auto. Ins. Co., No. 04-80034-CIV, 2004 WL 6247906, at *8 (S.D. Fla. Dec. 23, 2004) ("[I]n a case where a liability policy has limits of $100,000, and the plaintiff in the underlying tort action demands $100,001, an insurer that offers the full policy limit but refuses to pay a dollar more cannot be held to have acted in bad faith." (quoting Greenidge v. Allstate

<u>Ins. Co.</u>, 312 F. Supp. 2d 430, 439 (S.D.N.Y. 2004), <u>aff'd</u>, 446 F.3d 356 (2d Cir. 2006))).[1]

But, here, the evidence is that the costs of establishing the guardianship and special-needs trust would not have been an indemnity expense. Rather, the Decamps' expert — the same Mr. Doucette from the <u>LaVigne</u> case — opined that such fees would be allocated loss expenses, rather than indemnity expenses. (Doc. # 42-10 at 7, 10). Likewise, State Farm has paid to establish an injured adult claimant's guardianship in

---

[1] State Farm also cites to <u>Kropilak v. 21st Century Insurance Co.</u>, 806 F.3d 1062, 1068-70 (11th Cir. 2015), but that case is of no help to it. State Farm asserts that that case stands for the proposition that "bad faith cannot be imputed to an insurer . . . for failing to agree to a <u>Cunningham</u> agreement where nothing in its policy required it to agree to one." (Doc. # 61 at 3). Thus, State Farm reasons, "like <u>Kropilak</u>, bad faith cannot be imputed to State Farm for not paying Plaintiffs' legal expenses for establishing a guardianship and special-needs trust [] because the insurance policy did not require State Farm to pay them." (<u>Id.</u>). But <u>Kropilak</u> does not discuss an insurer's duty in relation to the terms of the insurance policy and certainly never analyzes the terms of the insurance policy at issue there. That is, <u>Kropilak</u> did not hold that the insurer had no duty to enter a <u>Cunningham</u> agreement or <u>Cunningham</u>-type agreement because the insurance policy did not require such agreement. Rather, the Eleventh Circuit held that the insurer did not act in bad faith by failing to enter a <u>Cunningham</u>-type agreement because "Florida law is clear that an insurer has no duty to enter into a <u>Cunningham</u> agreement." <u>Kropilak</u>, 806 F.3d at 1068. Thus, <u>Kropilak</u> relied on preexisting Florida law regarding an insurer's duties, rather than the terms of the insurance policy, to analyze bad faith. For this reason, <u>Kropilak</u> does not support State Farm's argument that its duty of good faith here was coterminous with the terms of its insurance policy.

order to facilitate a settlement and release in its insured's favor in at least twelve instances in Florida since 2009. In each of those instances, State Farm categorized the expense as a defense attorney cost or defense cost, rather than as an indemnity expense. <u>See</u> (Doc. # 64-2; Doc. # 64-1 at 35:10-38:15).

Notably, Mr. Doucette opined here that focusing on whether guardianship and special-needs trust expenses were explicitly outlined in the policy language was the wrong inquiry. <u>See</u> (Doc. # 42-10 at 10) ("It is irrelevant that the policy does not promise to pay for guardianship costs. The policy does not specify many of the very routine expenses insurers pay daily."). Mr. Doucette, instead, focuses on the standard practice and custom of the insurance industry. He opines that "in refusing to pay or contribute to the expense of the guardianship to resolve this catastrophic claim, State Farm was not acting consistent with the custom and practice in the industry." (Doc. # 42-10 at 10).

Taking all this evidence in the light most favorable to the Decamps, the Court cannot conclude as a matter of law that State Farm did not act in bad faith under the totality of the circumstances. Therefore, all of the Decamps' claims survive summary judgment to the extent they are premised on

State Farm's failure to pay the guardianship and special-needs trust costs.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

Defendant State Farm Fire & Casualty Company's Motion for Final Summary Judgment (Doc. # 45) is **GRANTED** in part and **DENIED** in part. Plaintiffs' claims survive summary judgment only to the extent they are premised on State Farm's failure to pay the costs of establishing a guardianship and special needs trust.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 10th day of November, 2021.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE